**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JAMES LUTCHER NEGLEY,       )
                                     )
       **Plaintiff,**         )
    v.                     )        **Civil Case No. 03-2126 (GK)**
                                     )
FEDERAL BUREAU OF         )
INVESTIGATION,            )
                                     )
       **Defendant.**       )
_____)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

     As this Court already has noted, Defendant Federal Bureau of Investigation (the

"FBI") "has managed to stonewall in this case for well over three years" and, thereby, has

thwarted attempts of Plaintiff James Lutcher Negley ("Negley") to obtain all documents

responsive to his Freedom of Information Act, 5 U.S.C. § 552 ("FOIA") request

(originally made almost six years ago).  Sadly, the FBI's stonewalling tactics typically go

unchecked (in FOIA cases) because it is able to cloak itself in such secrecy that

requestors of information and courts, despite their vigilance, are forced to accept

conclusory statements in boilerplate affidavits regarding the efficacy of searches done,

and the comprehensiveness of document productions, in response to FOIA requests.

     Fortunately, however, this is not a typical FOIA case.  Negley has uncovered the

FBI's system of maintaining records and practice for responding to FOIA requests.

Through the depositions of FBI employees, including David M. Hardy, the FBI Section

Chief of the Record/Information Dissemination Section, Records Management Division,

Negley discovered what many others likely believed but were unable to prove – that the

FBI's practice of searching its records in response to FOIA requests is significantly

flawed and is not designed to identify all responsive documents.  Perhaps more shocking, however, is that there are simple methods available within the FBI's record keeping system to allow the FBI to meet its obligations under FOIA, but the FBI chooses not to utilize them.  The FBI should no longer be permitted to get away with conducting a limited search by submitting its misleading boilerplate declaration in every case.

In Negley's case, and as set forth more fully below, the FBI has conceded that it failed to conduct an adequate search for responsive documents.  The FBI did not bother to search four electronic databases maintained by the FBI, some of which permit full-text searching (a method of searching the entire document for search terms, as oppose to searching only a pre-determined index of the document).  And the FBI refused to search for paper records, even though it maintains an index-system for non-electronically generated documents and it knew the name of the agent involved in the FBI's investigation of Negley and, therefore, could have searched for personal files.  And what the FBI did search was unilaterally narrowed to the UNABOM investigation.

Moreover, the FBI's production of the documents that its limited search has revealed over the past five plus years is inadequate.  The FBI concedes that other responsive documents exist, but it has chosen not to produce them for no valid reason.  Incredibly, the FBI admits that it even has refused to produce documents that it knows this Court ordered it to produce.

In light of these undisputed material facts, Negley requests that this Court grant his motion and enter partial summary judgment against the FBI as set forth herein.

## I.   STATEMENT OF MATERIALS FACTS NOT IN DISPUTE

### A.   The FBI's Unreasonable and Unreliable Search Practice.

#### 1.   The FBI's records management and information dissemination system, as explained by Hardy's boilerplate declaration.

Although cloaked with verbose rhetoric and confusing technicalities, Hardy's boilerplate declaration[1] (his first declaration in this case) sets forth the basic structure of how the FBI maintains records and searches for documents responsive to a FOIA request. The maintenance of the FBI's investigatory information, both paper and electronic, is called the Central Records System (the "CRS"). See Ex. 3 (Declaration of David M. Hardy), ¶ 20.[2]  With regard to the electronic component of the CRS, in October 1995, the FBI took approximately 105 million records that were maintained on existing automated systems and consolidated them into the Automated Case Support (the "ACS"). See id., ¶ 23.  The ACS consists of three separate databases:  (1) Investigative Case Management ("ICM"), which allows for and contains documents related to administrative management of cases; (2) Electronic Case File ("ECF"), which contains all FBI-generated documents and is full-text searchable (the documents themselves are uploaded on ECF and can be viewed); and (3) Universal Index ("UNI"), which contains indexes of all cases and

---

[1] Hardy routinely submits the same declaration, simply filling in blanks related to the specific FOIA request.  See, e.g., Jefferson v. Bureau of Prisons, No. 05-848, 2006 U.S. Dist. LEXIS 81972 (D.D.C. Nov. 7, 2006); Dinsio v. FBI, 445 F. Supp. 2d 305 (W.D.N.Y. 2006); O'Neill v. DOJ, No. 06C0671, 2007 U.S. Dist. LEXIS 37807 (E.D. Wis. May 23, 2007); see also, e.g., Davin v. DOJ, 60 F.3d 1043 (3d Cir. 1995) (same declaration was executed by another FBI official prior to Hardy joining the FBI).

[2] To avoid duplication, only Exhibit I of Hardy's Declaration is attached (as Exhibit 3-I hereto).

documents but permits a search only of the indexed names (only a listing of documents is available; the actual documents are not searchable or viewable on UNI).  See id.

As a general matter, FBI records are indexed by the name of an individual or organization.  See id., ¶¶ 21-22.  The decision of what names to index for a particular document are largely left to the discretion of the individual agent who creates/authors the document.  See id., ¶ 24.  Therefore, when an individual requests documents based on a name (as Negley initially did here), the FBI can conduct index searches (on UNI) using a variety of combinations of the name to locate some responsive documents.  See Ex. 5 (Third Declaration of David M. Hardy), ¶ 15.

> ### 2.     The FBI's practice is not to search its entire records management system, as revealed through deposition testimony.

Although the FBI's CRS is quite comprehensive, and the FBI gives the impression that the entire CRS is searched, Negley has determined that, in practice, there are glaring deficiencies in the manner in which the FBI actually searches for documents responsive to a FOIA request.  Hardy's declaration, which likely has been used time and time again, conceals these many inadequacies that were uncovered during discovery.

Fundamentally, and contrary to the loose terminology employed by Hardy in his declaration, there is no such thing as "CRS indices searches."  See Ex. 3, ¶ 25.  In fact, there cannot be because the "CRS" is nothing more than the name given to the FBI's system of records management.  In reality, the FBI searches for responsive documents only on one of the three ACS databases:  the UNI database.[3]  See Ex. 6 (Excerpts of

---

[3] Thus, the proper terminology for the search conducted by the FBI is UNI index search.  See Ex. 8 (Excerpts of Deposition Transcript of Sandra A. Figoni (July 13, 2007)), at 93.

Deposition Transcript of David M. Hardy (Mary 23, 2007)), at 43-44.  The UNI database, however, searches only the indexed name(s) identified by an agent at the time the document was indexed.  And a search of the UNI database does not full-text search entire documents for particular name(s).  See id. at 45-46.  As a practical matter, then, "if a case agent did not put an individual's name as an index, then the UNI search would not . . . produce that particular file[.]"  See id. at 48.  This is the case even if an individual's name appears one time – or one hundred times – in the document.

In contrast, the ECF permits full-text searching, which means that a document will be identified if a name appears anywhere in the document.  See Ex. 8, at 103-04. Yet, as a matter of course and for no legitimate reason, unless the FBI has a "strong suspicion" that responsive documents – other than those identified in UNI – exist, the FBI does not search ECF (and it did not here).  See Ex. 6 at 198.  Nor does the FBI generally make any attempt to search the ICM (and it did not here), which allows discovery of materials such as an "1A" (an agency term to reference an envelope that could contain handwritten notes regarding an investigation) and certain restricted documents.  See Ex. 8 at 94-96, 99-101, 108.

And there is more.  Negley learned during discovery that the FBI maintains a completely separate electronic database for the UNABOM investigatory file, called the Zylmage database (the "Zy Database").  See Ex. 9 (Excerpts of Deposition Transcript of Jennifer A. Wilson (June 27, 2007)), at 15-16.  Records on the Zy Database are indexed and those indices are searchable through the UNI.  See id. at 16-17.  However, documents in the Zy Database that were created by the FBI are full-text searchable using the Zy Database (like documents in ECF).  See id. at 19-20.  Notably, none of Hardy's four

declarations or his deposition testimony make any mention of the existence of the Zy

Database or that the FBI ever searched the Zy Database for documents responsive to

Negley's FOIA request.

In addition, FBI practice (again employed in this case) is to make no attempt to

search for a variety of other materials, including:

- Paper documents (i.e., documents created before records were maintained electronically).  See Ex. 6 at 25-30.[4]

- Handwritten notes of case agents (e.g., notes during interviews), unless placed into an 1A envelope.  See id. at 53.

- Personal notes/file of an agent or a supervisor generated during an investigation.  See id. at 65-66.

- Restricted documents.  See Ex. 8 at 96, 108.

**B.**     **Employing its Unreasonable and Unreliable Practice, the FBI's Search in Response to Negley's FOIA Request was Inadequate and its Production was Deficient.**

On January 16, 2002, Negley submitted a FOIA request to the FBI for "any

records about me maintained at and by the FBI in [the San Francisco] field office [(the

"SFFO")]."  See Ex. 1-A.[5]  The FBI responded that a search of the San Francisco

Division files revealed no records responsive to Negley's FOIA request.  See Ex. 1-B.

Negley filed an appeal of the FBI's response on February 14, 2002.  See Ex. 1-C.

In the appeal, Negley noted that documents produced under a prior FOIA request to the

---

[4] The FBI would need to do a manual search of indices maintained on index cards in warehouses at the field offices and FBI headquarters.

[5] A copy of the complaint is attached as Exhibit 1 (with attached Exhibits A-I).

Sacramento Field Office[6] made specific reference to a Main File number (File Number 149A-SF-106204) (the "Main File"), which appeared to denote a San Francisco file containing information about Negley that would be responsive to Negley's FOIA request. See id. On April 23, 2002, Negley amended his January 16, 2002 FOIA request to include other "SF" files that were referenced in documents previously produced by the FBI to Negley in response to his FOIA request to the Sacramento Field Office. See Ex. 1-D. Specifically, under the amended FOIA request, in addition to all files about him maintained at and by the SFFO, Negley expressly requested File No. 149A-SF-106204-S-1575 ("File S-1575") in its entirety, regardless of its content:

> As you can see[,] my San Francisco FBI file no. is 149A-SF-106204-Sub S-1575.  Please amend my 1/16/2002 FOIA request to your office to include this file no. . . .

See id. Negley recently clarified under oath that he sought File S-1575 irrespective of its content:

> To the extent that there is any ambiguity in the language of my April 23, 2002 correspondence to the FBI, **it was and still is my intent to amend my FOIA request to include, in addition to all files about me at the SFFO, the entire File No. S-1575, regardless of whether or not that file is about me**.

Ex. 2, ¶ 3 (emphasis added).[7]

---

[6] The Sacramento FOIA request requested "all records concerning [Negley] maintained at the FBI's field office in Sacramento, California[,]" and was the subject of a previous lawsuit in the United States District Court for the Western District of Texas, Negley v. DOJ, No. A-01-CA-057JRN (W.D. Tex. Mar. 26, 2002) (Report and Recommendation of Magistrate Judge, accepted by Court on April 10, 2002).

[7] In an effort to avoid duplication, only Negley's Supplemental Declaration, and Exhibit C thereto, is attached (hereto as Exhibit 2).

The FBI responded on April 30, 2002, changing course and admitting that there were records responsive to Negley's FOIA request at the SFFO (albeit the same documents produced by the Sacramento Field Office in response to the prior FOIA request), but it did not produce any documents.  See Ex. 1-E.  Curiously, even though Negley directed the FBI to specific file numbers, including the Main File and File S-1575, the FBI made no mention of those files.  See id.

Because the previously produced documents concerning Negley specifically mentioned file numbers with the notation "SF" (presumably San Francisco), however, Negley believed that there were additional documents in the SFFO that were responsive to the San Francisco FOIA Request.  As a result, Negley once again appealed.  See Ex. 1-F.

The FBI responded on September 30, 2002, reiterating that Negley was discussed in files located at the SFFO.  See Ex. 1-G.  This time, and once again changing course, the FBI actually produced thirty-seven documents (12 pages were redacted) from File No. 149A-SF-106204-S0-3041 ("Serial 3041"), a serial from the Main File, that were responsive to Negley's FOIA request.  See id.  The FBI, however, withheld other responsive documents from Serial 3041 based on FOIA Exemptions.  See id.

Remarkably, the FBI once again in effect ignored Negley's FOIA request for documents in File S-1575.  With regard to File S-1575, the FBI summarily stated:

> Please be advised that the records that consist of the San Francisco Field Office's 149A-SF-106204-S-1575 are not the same records that you faxed to our Office and are not responsive to your request for records concerning you.

See id.

On October 7, 2002, Negley's counsel sought clarification of the FBI's latest response.  See Ex. 1-H.  Counsel took particular issue with the FBI's position regarding

File S-1575, again noting that previously produced documents concerning Negley made specific reference to File S-1575 and, therefore, File S-1575 appeared to be responsive to Negley's initial FOIA request (and certainly to his amended FOIA request).  See id. Leaving no room for dispute, counsel attached to his letter the documents previously produced in response to Negley's prior FOIA request (to the Sacramento Field Office) that made specific reference to File S-1575.  See Ex. 2-C (third and fourth pages are clean copies of documents attached to counsel's letter, with handwritten notation of "Sub S-1575" and "S-1575" at bottom right corner, respectively); see also id. (first page is additional document with handwritten notation towards the middle of the page, in between the "Synopsis" and "Reference" sections, identifying Negley as "Suspect 1575").  The FBI responded on November 26, 2002, stating both that File S-1575 does not pertain to Negley and that the records were being withheld under FOIA Exemptions. See Ex. 1-I.[8]

At that point (almost one year after Negley submitted his FOIA request), and after four attempts by Negley to obtain documents in response to his FOIA request, the FBI had released – from Serial 3041 of the Main File only – 25 non-redacted pages and 12 redacted pages, for a total of 37 pages.  No documents from File S-1575 were produced. Dissatisfied with the FBI's search for, explanations regarding and lack of production of documents responsive to Negley's FOIA request, including File S-1575, Negley filed the

---

[8] This latter position suggests that File S-1575 is in fact responsive to the San Francisco FOIA Request, but that portions of the file arguably could be subject to FOIA Exemptions.  See id.  This would require production of File S-1575 and an index pursuant to Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973), for any redactions/ withholdings, which was not done by the FBI here.

pending lawsuit to obtain a complete production of agency records responsive to his FOIA request.  See generally Ex. 1.

Following remand,[9] this Court ordered the FBI to produce Serial 3041 in its entirety.  Order dated January 8, 2007 (Doc. #43), ¶ 1.  Through two filings in response to this Court's Order, the FBI represented that, in addition to the 37 pages produced prior to the lawsuit, the FBI had produced (since the inception of the lawsuit) an additional 9 redacted pages (and one page was withheld in its entirety), and was producing an additional 2 pages, from Serial 3041.  See Praecipe dated January 16, 2007 (Doc. #45) and Notice of Correction to Praecipe dated January 19, 2007 (Doc. #47).  Evidently, the last two pages were "found" following a "hand search," which inexplicably the FBI had not conducted in the prior five years since Negley's FOIA request first had been made. See Correction to Praecipe dated January 19, 2007 (Doc. #47).

In total, the FBI has produced – from Serial 3041 of the Main File only – 27 non-redacted pages and 21 redacted pages, and indicated that one page was being withheld in its entirety, for a total of 49 responsive pages.  No documents from any other serials of the Main File or File S-1575 have been produced.

And, as set forth above, the FBI has searched only UNI, using Negley's name, for responsive documents;[10] no search has been done on ICM[11] or the full-text ECF[12] or Zy

---

[9] The FBI previously was granted summary judgment in this action, but that judgment was reversed on appeal.

[10] See Ex. 6 at 193; Ex. 3, ¶ 25.

[11] See Ex. 8 at 94-96, 99-101.

[12] See Ex. 6 at 198.

Database (or any other FBI database, such as "ELSUR" (Electronic Surveillance Indices)).  Moreover, the FBI has made no effort to search:  paper records using the card system for pre-electronic documents;[13] handwritten notes, including of the case agent's investigation of Negley;[14] personal notes/files of any FBI employees;[15] and restricted documents.[16]  Finally, it appears that the FBI unilaterally decided, at some point, to limit the scope of its search for responsive documents to the UNABOM file.[17]

      **C.**     **File S-1575 is about Negley.**

On March 12, 2007, Negley deposed "the [FBI] agent with the most knowledge regarding the investigation of Mr. Negley" – Assistant Special Agent-in-Charge Clifford Holly ("ASAC Holly").  ASAC Holly, who personally conducted the interview of Negley in September 1995 and was a member of the UNABOMB task force familiar with the file numbering system used in the investigation for UNABOMB suspects, testified that File S-1575 relates to Negley:

> Q    Okay.  If you can look at Exhibit 4[18] that's the October 4, '95 document.
> . . .
> Q    Does that in any way change your answer or educate you as to what might have been the file number assigned to Mr. Negley?
> A    So it looks like that there would be a Sub S suspect file number, and this is chopped off but it looks like it would be 1575.

---

[13] See Ex. 6 at 25-30.

[14] See Ex. 6 at 53.

[15] See Ex. 6 at 65-66.

[16] See Ex. 8 at 96, 108.

[17] See Ex. 4, ¶ 3; Ex. 5, ¶ 3.  Negley's FOIA request contains no such limitation.

[18] Exhibits 3, 4 and 5 introduced at ASAC Holly's deposition are the documents attached hereto as Exhibit 2-C.

**Q    But would you anticipate that that Sub S 1575 would relate to Mr. Negley or could that relate to someone else?**
**A    No, I would -- because it's on Exhibit Number 4 relative to the investigation conducted and the interview conducted with Mr. Negley, that that would be attributed to Mr. Negley, 1575. . . .**

Ex. 7 (Excerpts of Deposition Transcript of Clifford C. Holly (March 12, 2007)), at 115

(emphasis added).  Although ASAC Holly recognized that the documents could be

confusing at first glance, after reviewing all of the materials, it was clear to him:

> Q    And if I can also have you look at Exhibit 5[.] . . .
> . . .
> A    That's what -- I had seen that and that's what was most confusing to me is I'm seeing an S with 7575 and then I've got on Exhibit 3 1575 but now that you point out on what's Exhibit 4, now it makes sense.  **1575 as a suspect sub file makes sense.**
> **Q    For Mr. Negley?**
> **A    For Mr. Negley.**

Id. at 115-16 (emphasis added).

On cross-examination, despite the FBI's counsel's attempt to convince the FBI's

own witness that he either misunderstood the questioning or unintentionally indicated

that File S-1575 was related to Negley, ASAC Holly testified again and again that File S-

1575 related to Negley:

- "**The Sub S 1575 based upon my recollection appears to be the suspect file under which we documented and worked on the interview of Mr. Negley.**" Id. at 144 (emphasis added).

- "Q . . . And do you know for sure -- can you tell by the number alone whether it relates to Mr. Negley alone or whether it relates to some other designation or category?
  . . .
  A   Exhibit 4 indicates that it would reflect Mr. Negley." Id. at 146.

- Q    Okay.  Do you know exactly what S 1575 or 7575 is?
  . . .
  A    It appears to be the suspect sub file for Mr. Negley. Id. at 144.

So that there would be no doubt, Negley's counsel questioned ASAC Holly one last time:

> Q    Even putting aside Exhibit 5, if you just look at Exhibit 4, Exhibit 4 is about Mr. Negley, correct?
> A    Lead coverage involving James Negley.
> Q    Okay.  So the reference there to the Sub S 1575, that sub file number, even apart from Exhibit 5 would you still conclude that that refers to a sub file on suspect 1575 which is Mr. Negley?
> A    It appears to.
> Q    And Exhibit 3 that's the 10/18/95 document, towards the middle where it says suspect 1575, **does that also suggest to you or confirm for you that there was -- that Mr. Negley was suspect 1575 with the file number 149A-SF-106204?**
> **A    Yes.**
> **Q    And so that I understand how FBI file numbers work, would that suggest that the file number would be 149A-SF-106204-S-1575?**
> **A    Correct.**

Id. at 166-67 (emphasis added).  Yet, the FBI has refused to produce File S-1575.

> **D.    The FBI Refuses to Produce Documents It Admits are Responsive to Negley's FOIA Request.**

In Hardy's second declaration, he stated that as a result of a "renewed" search, the FBI discovered that "plaintiff's name was indexed to serials 3041 and 3865[19] in subfile S-0, a subfile in the main UNABOM file."  See Ex. 4 (Second Declaration of David M. Hardy), ¶ 7.  Hardy further declared, under penalty of perjury, that Serials 3041 and 3865, "which consist of 47 pages, have been processed and released to plaintiff previously." See id.

In his third declaration, however, Hardy represented that, in fact, Serial 3041 consisted not of the 47 or 49 pages previously identified by the FBI, but rather of seven additional pages (for a total of 56 pages).  See Ex. 5, ¶ 5 n.2.  Hardy previously also

---

[19] Serial 3865 refers to File No. 149A-SF-106204-S0-3865.

acknowledged that the FBI was aware that this Court ordered production of Serial 3041 in its entirety, and declared, under penalty of perjury, that "the releaseable portions of it were produced[.]"  See Ex. 4, ¶ 8(f).  Yet, at his deposition, Hardy unabashedly testified that the FBI has not produced at least seven pages from Serial 3041, and expressed no concern that those seven pages were not releasable.  See Ex. 6, at 169-70:

> Q.  In fact, today you still haven't produced these seven other pages.
> A.  Correct. . . .

With respect to Serial 3865, Hardy's second declaration was the first time that the FBI mentioned that Serial 3865 contained documents responsive to Negley's FOIA request.  To date, the FBI has not explained why Hardy's first declaration or the many searches that the FBI indicated were previously conducted did not reveal and/or discuss Serial 3865.  See id. at 170 ("Q.  Why isn't there any mention here of serial 3865?  A. Well, there should have been.").  Regardless, and remarkably, despite admitting the existence of responsive documents in Serial 3865, Hardy testified at his deposition that the FBI has not released the contents of Serial 3865 to Negley.[20]  See id. at 136.

## II.   ARGUMENT

### A.    Standard for Granting Summary Judgment.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly

---

[20] Hardy testified that there are 47 pages in Serial 3865.  See Ex. 6 at 132.

supported motion for summary judgment; the requirement is that there be no genuine

issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)

(emphasis in original removed).  To this end, and although the Court must view the

evidence in the light most favorable to the non-movant, "[t]he mere existence of a

scintilla of evidence in support of the plaintiff's position will be insufficient" to withstand

summary judgment.  Id. at 252.  To the contrary, "[o]nly disputes over facts that might

affect the outcome of the suit under the governing law will properly preclude the entry of

summary judgment."  Id. at 248.

> **B.      Negley is Entitled to Partial Summary Judgment that the FBI Failed
>          to Conduct a Reasonable Search for Responsive Documents in
>          Violation of Its Obligations Under FOIA.**

> **1.      The FBI's practice in responding to FOIA requests is
>          unreasonable, unreliable and inadequate.**

> "A number of judicial decisions, particularly from the District of
> Columbia Circuit Court of Appeals, reflect judicial frustration with the
> agencies' administration of the Act," especially in light of "the advantages
> government agencies enjoy . . . because of their control of the documents
> and knowledge of their character and content."

Robert G. Vaughn, Administrative Alternatives and the Federal Freedom of Information

Act, 45 Ohio St. L.J. 185, 1919-92 (1984) (footnote omitted).  This problem has become

exacerbated over the past twenty years by the advent of computerized records.  Agencies

are able to submit affidavits in support of the alleged undue burden and hardship to

manually search for records and then perform only cursory searches of electronic records.

See, e.g., Michael J. Sniffen, FBI Tries to Limit Info Searches, CBS News, Jan. 21, 2005,

http://www.cbsnews.com/stories/2005/01/21/national/main668365.shtml.  For the most

part, and since discovery does not typically occur in FOIA cases, requestors of

information under FOIA are left with no means of checking or challenging the agencies' representations.

Admittedly, on its face, Hardy's first declaration suggests that the FBI's complex CRS provides for comprehensive – and, therefore, adequate – searching.  But, when combined with the information uncovered during discovery in this case, the declaration actually proves that the manner in which the FBI conducts searches is far from adequate – generally and specifically in the case of Negley's FOIA request.

The glaring problem with the FBI's practice for searching for responsive documents, which was employed here, is that **despite the existence of no less than five different sources of searchable records – paper documents, UNI, ECF, ICM[21] and a stand alone database such as ELSUR or Zy – the FBI only searches <u>one</u> source for identifying responsive documents (UNI)**.  <u>See</u> Ex. 6 at 43-44, 193, 198.  In addition, FBI practice – again, followed in connection with Negley's request – is to not ask agents/supervisors for personal files of investigations.[22]

Moreover, the one database searched, UNI, allows only for an index search.  <u>See</u> Ex. 6 at 45-46.  Only searching UNI is inadequate for two reasons:  First, determining

---

[21] By refusing to search the ICM, responsive records, such as handwritten notes contained in an "1A" and restricted documents, which are only referenced in the ICM, will not be identified and/or produced in response to a FOIA request.  <u>See</u> Ex. 8 at 94-96, 99-101, 108; Ex. 6 at 53.

[22] <u>See</u> Ex. 6 at 65-66; Ex. 8 at 56-57 ("My experience in FOIA would be to retrieve documents through the search of our index record and deal with those documents that were retrieved.  The only time an agent would be consulted is if there was some sensitivity to perhaps the investigation."); <u>see</u> <u>also</u> Ex. 7 at 52 (ASAC Holly testifying that no one has asked him to look for his notes taken during the Negley investigation).  Although these may contain some duplicative pages, personal files also may contain different documents, such as handwritten notes, that were never placed in the file.

what terms to index is left entirely to the discretion of an agent.  See Ex. 3, ¶ 24.  This can be problematic because the agent, who does not receive any training on the purpose or procedure for indexing, may focus only on names that are relevant at that time, rather than all names mentioned in a document.  See Ex. 8 at 45.  Second, by its very nature, an index search does not search the entire document; rather, it searches only the handful of names that the agent chose to index.  As a result, UNI allows the user neither to input a phrase or key words other than the name (such as other identifying information or a specific business), nor to search the text of computerized records to locate documents containing names, phrases or key words.  For these reasons, searching only UNI virtually guarantees that there exist documents about individuals that are not identified.  See Ex. 6 at 48 ("[I]f a case agent did not put an individual's name as an index, then the UNI search would not . . . produce that particular file[.]"); see also Ex. 8 at 40 ("[I]f you're looking for something specific and you think it's in some kind of case file, you would have to do a hand search if it wasn't indexed.").  The FBI's approach, then, appears to be to do the bare minimum to search for responsive documents because it knows that the vast majority of requestors will never know the extent of its document repositories or its searching ability.

Remarkably, the FBI has the ability to make its electronic searches more comprehensive, but it simply chooses not to.[23]  There is no legitimate reason why the FBI

---

[23] According to Figoni (the FBI's designated "records custodian" for the SFFO), index searches are done in lieu of full-text searches because the response time is faster.  See Ex. 8 at 87-88; see also id. at 61 (noting that the staffing level at the SFFO is "always a problem").

does not conduct full-text searches[24] of ECF and the Zy Database and search ELSUR and

ICM, in addition to the UNI index search.  Nor is there any legitimate reason why the

FBI does not use the card system to search paper records[25] for the same terms searched

on UNI and does not attempt to obtain personal files or notes of agents that investigated a

particular individual (who is requesting FBI information about himself).  The FBI's

willful blindness in this regard cannot be tolerated.

Given the FBI's practice, all searches conducted by the FBI for documents

responsive to a FOIA request potentially are inadequate.  The FBI's flawed practice

frustrates the very purpose of FOIA, which is to "facilitate public access to Government

documents" and is "meant to pierce the veil of administrative secrecy and to open agency

action to the light of public scrutiny."  McCutchen v. Dep't of Health & Human Servs.,

30 F.3d 183, 184 (D.C. Cir. 1994) (citation omitted); see also Stern v. FBI, 737 F.2d 84,

88 (D.C. Cir. 1984) ("The central purpose of FOIA is to 'open[] up the workings of

government to public scrutiny' through the disclosure of government records.") (citation

omitted); Mack v. Dep't of the Navy, 259 F. Supp. 2d 99, 104 (D.D.C. 2003) (noting that

the purpose of FOIA is to "afford[] the public access to virtually any federal government

record that FOIA itself does not specifically exempt from disclosure").

Perhaps not surprisingly, other courts already have admonished the FBI for its

systematically flawed approach to search for documents and respond to FOIA requests.

---

[24] Figoni admitted that the global full-text search is more complete because it searches the actual text (rather than just an index) of all FBI generated agency records. See Ex. 8 at 87-90.

[25] Cf. Terry D. Turchie & Kathleen M. Puckett, Hunting the American Terrorist: The FBI's War on Homegrown Terror 4 (2007) ("The UNABOM case files themselves now lie in a dusty heap on the floor of the FBI garage in San Francisco").

For example, three months ago, the Eastern District of Wisconsin denied summary judgment for the FBI (which was based on a Hardy declaration). See O'Neill v. DOJ, No. 06C0671, 2007 U.S. Dist. LEXIS 37807 (E.D. Wis. May 23, 2007). In O'Neill, the plaintiff sought FBI records related to the FBI's electronic surveillance system. Hardy's declaration described two records maintenance systems – ELSUR and CRS – and, like here, indicated that the FBI only searched one database for responsive documents. The Court found the declaration "insufficient to establish that the FBI conducted a reasonable search for records responsive to plaintiff's request." Id. at *9. Specifically, Plaintiff's request "sought records referring to a particular subject, not records confined to a specific database." Id. at *9-10. With regard to CRS, the Court noted that "even if the CRS does not contain information relating to electronic surveillance, the Hardy affidavit does not assert that the FBI does not have some other third information storage system that could contain responsive documents." Id. at 10. On this basis, the Court denied the FBI's motion for summary judgment.

Similarly, in Biberman v. FBI, 528 F. Supp. 1140 (S.D.N.Y. 1982), the Court denied the FBI's motion for summary judgment based on an inadequate search. Specifically, the plaintiffs submitted FOIA requests for documents related to them. The FBI, which conducted only an index search on UNI, asserted that case law allowed them to rely solely on an index search, but that if plaintiffs sought other searches, they could submit additional FOIA requests. Id. at 1144. The Court disagreed, noting that in other reported cases, the FBI used ELSUR (at the time the only other database containing potentially responsive documents) to locate responsive documents, but that it did not do so here. Id. In addition to taking issue with the FBI's failure to search other databases

(which now also include ECF, ICM and the Zy Database), the Court rejected the FBI's position that it "will not use any index other than [CRS] unless the plaintiffs are knowledgeable enough about FBI recordkeeping to request the search of a specific index." Id. at 1144-45. As this Court should do here, the Biberman court held that the search was inadequate until all sources of documents "which are reasonably likely to contain references to plaintiffs" were searched. Id. at 1145.

Indeed, this Honorable Court previously rejected the FBI's approach to searching for responsive documents as attested to by Hardy. See Jefferson v. Bureau of Prisons, No. 05-848, 2006 U.S. Dist. LEXIS 81972 (D.D.C. Nov. 7, 2006). In Jefferson, the plaintiff submitted a FOIA request to the FBI for all records concerning a former jail official. Id. at *6. According to Hardy's declaration, the FBI conducted an index search and found one main file concerning an investigation of the individual at issue. Id. at *16-17. However, the FBI did not search any other databases or the FBI's I-drive, which is the shared drive used to hold investigative documents for supervisor approval. Id. at *17. Noting that an agency must show "beyond material doubt" that it conducted a reasonable search, this Honorable Court rejected Hardy's affidavit: "Even if an agency states that it has searched its central file system, the failure to aver that all files likely to contain responsive records were searched, precludes the Court from finding that the search was adequate." Id. at *19. On that basis, this Court held that the search was inadequate and denied the FBI's motion for summary judgment.[26]

---

[26] See also cases cited infra & Schrecker v. DOJ, 254 F.3d 162, 164 (D.C. Cir. 2001) (in reversing summary judgment for the FBI, Court expressed more than "a little dismay" at FBI's failure to search for "tickler" files (potentially duplicate files kept by supervisor) solely because they are not indexed under the CRS indexing system).

Unfortunately, most requestors of information do not have the benefit of the discovery taken in this case and, therefore, will not be able to set forth clear FBI testimony evincing the systematic problems in the FBI's practice. Sadly, until the FBI is ordered to change its flawed, unreasonable, unreliable and inadequate practice, requestors, such as Negley, will continue to be aggrieved.[27]

### 2.   The FBI's search for documents responsive to Negley's FOIA request was unreasonable, unreliable and inadequate.

In order to gauge how flawed the FBI's practice is, the Court need look no further than the FBI's response to Negley's FOIA request. To this end, to establish that its search was adequate, the FBI must "show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." Oglesby v. Dep't of the Army, 920 F.2d 57, 68 (D.C. Cir. 1990). An affidavit submitted in support of an agency's search must

---

[27] Indeed, Terry D. Turchie, the FBI Director of the UNABOM Federal Task Force, confirms that the FBI's computerized system (upon which searches are to be conducted) has glaring deficiencies:

> On one memorable occasion, our whole management team dealt for weeks with a delegation from Information Systems at FBIHQ. They wanted to put UNABOM on the Automated Case System (ACS) . . . . In UNABOM, we held our ground, and we winced later at the experience of our OKBOM colleagues, who were among those who suffered as a result of the notorious FBI computer inadequacies that have cost close to a billion dollars over the past decade. After nearly 20 years of frustration in UNABOM, we didn't need a dodgy computer system to slow us down when it came to finally prosecuting the Unabomber for his crimes.

Turchie, Hunting the American Terrorist: The FBI's War on Homegrown Terror, at 88; see also id. at 110 ("As many people have worked on this, and as hard as many have tried to achieve it, there is still no adequate, automated case file system that fully supports the FBI's massive responsibilities in counter-terrorism and other areas.").

demonstrate and explain "with reasonable detail[] that the search method . . . was reasonably calculated to uncover all relevant documents."  Id.; see Nation Magazine v. U.S. Customs Service, 71 F.3d 885, 890 (D.C. Cir. 1995) ("The affidavits must be reasonably detailed . . . , setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched.") (internal quotation and citation omitted).  In evaluating the supporting affidavit, courts apply a "reasonableness" test, keeping in mind "congressional intent tilting the scale in favor of disclosure."  Campbell v. DOJ, 164 F.3d 20, 27 (D.C. Cir. 1998).

Here, the FBI has identified 49 pages (albeit some redacted and withheld) from Serial 3041 as responsive to Negley's FOIA request.  However, the FBI has searched only UNI, using Negley's name, for responsive documents[28]:

- No search of the ICM database has been done, see Ex. 8 at 94-96, 99-101, 108;

- No search of the full-text ECF database has been done, see Ex. 6 at 198;

- No search of ELSUR has been done;

- No search of the full-text Zy Database has been done;

- No search of the card system for paper documents has been done, see id. at 25-30;

---

[28] See Ex. 6 at 193 ("We did not conduct an additional search beyond what we've talked about about the UNI search[.]"); see also Ex. 3, ¶ 25 (Hardy's declaration confirms that an UNI index search (although mislabeled as a "CRS" index search), and no other search, was conducted in response to Negley's FOIA request).

- No search of/for handwritten notes, including of the case agent's interview of Negley, has been done, see id. at 53;

- No search of/for personal notes/files of any FBI employees has been done, see id. at 65-66;

- No search of restricted documents has been done, see Ex. 8 at 96, 108; and

- The FBI mistakenly assumed, after its initial inadequate search, that Negley sought only documents "about himself in the UNABOM file located in the FBI's San Francisco Field Office" and, therefore, limited all of its subsequent searches to the UNABOM file, see Ex. 4, ¶ 3; Ex. 5, ¶ 3.

The limited nature of the FBI's search, however, was concealed by the comprehensive-sounding (four) Hardy declarations.  Indeed, had Negley not deposed four FBI employees, neither he nor this Court would know the many inadequacies with the searches conducted by the FBI.  For example, after generally explaining the CRS, Hardy's first declaration only briefly and summarily describes the search conducted in response to Negley's FOIA Request:

> As plaintiff was advised previously, after repeated CRS indices searches, the SFFO did not identify any main files in which plaintiff is the subject. However, plaintiff is mentioned briefly in a total of 47 pages of documents in file 149A-SF-106204, which relates to the FBI's investigation of the "Unabomber."  File 149A-SF-106204 concerns an investigation into the destruction of aircraft or motor vehicle, and the subjects of the file are individuals or organizations other than plaintiff.

See Ex. 3, ¶ 25.  As revealed in discovery, however, the affidavit is incorrect – Negley is "mentioned," not in 47 pages of File No. 149A-SF-106204, but in (at least) 56 pages in Serial 3041, 47 pages in Serial 3865, and, according to ASAC Holly, in File S-1575.

When questioned at his deposition about this discrepancy, Hardy eventually admitted that his declaration was "incomplete" in this regard.  See Ex. 6 at 170-71.

Moreover, as a matter of law, affidavits such as this (that only contain conclusive statements of searches of one record system when others exist) are routinely deemed insufficient to establish that an agency fulfilled its burden under FOIA.  See, e.g., Nation Magazine, 71 F.3d at 890 (in ruling that agency "cannot limit its search to only one record system if there are others that are likely to turn up the information requested," court noted that conclusory statements that the agency has reviewed relevant files are insufficient as a matter of law) (internal quotations and citation omitted); Campbell, 164 F.3d at 27-29 (holding that district court erred in finding adequate search because, after FBI's UNI searches revealed no responsive documents, FBI was required to broaden its searches to explain the existence of documents that it could not locate in main file searches); Oglesby, 920 F.2d at 68 (holding that the adequacy of the search was improper when affidavit stated "[b]ased upon the information contained in Mr. Oglesby's letter . . ., a search was initiated of the Department record system most likely to contain the information . . ., namely, the Central Records") (internal quotations omitted).

Hardy's supplemental declarations do not address the inadequacies of the FBI's search either:  there is no mention of (not) searching for paper records at the SFFO or FBI headquarters, or of (not) searching the ICM, ECF, ELSUR or Zy Database for responsive documents; and, there is no indication that ASAC Holly or his supervisor were asked for any handwritten notes or personal file related to Negley.  See Dinsio, 445 F. Supp. 2d at 312 (denying FBI's motion for summary judgment based on Hardy's declaration; "[h]ere, Hardy has done little more than recite what is obvious from the correspondence between

plaintiff and the FBI. . . . There is no explanation of what records were searched, or what search terms or methods were employed.").

Further evidence of the inadequacy of the search is revealed when comparing the pages that have been produced to date, see Ex. 3-I, with additional FBI documents that Negley possesses (some of which he forwarded to the FBI to direct it to other files), see Ex. 2-C. Notably, some of the documents contained in Exhibit 2-C, which are clearly responsive to Negley's FOIA request, were never produced in this case. When confronted with this evidence, even Hardy admitted that the FBI's search was inadequate in that there could be other responsive documents that were never searched or produced in this case. See Ex. 6 at 188-93.

Fundamentally, the FBI has conceded that it refused to search multiple sources that are likely to reveal the existence of other documents responsive to Negley's FOIA request. In so doing, the FBI has demonstrated, as a matter of law, that its search methods were not "reasonably calculated to uncover all relevant documents." Oglesby, 920 F.2d at 68. As a result, this Court should enter partial summary judgment in favor of Negley on the ground that the FBI's search was unreasonable and is inadequate, and further order the FBI to conduct searches of the ICM, ECF, ELSUR and Zy databases, the card system in the SFFO and FBI headquarters, for handwritten notes, for personal files and for restricted documents, for documents responsive to Negley's FOIA request (that is, documents that relate to or reference Negley).

**C.** **Negley is Entitled to Partial Summary Judgment that the FBI's Production of Documents Responsive to Negley's FOIA Request Is Inadequate.**

FOIA itself expresses a presumption favoring disclosure. <u>Founding Church of Scientology of Washington, D.C., Inc. v. Smith</u>, 721 F.2d 828, 831 n.4 (D.C. Cir. 1983). The reasoning behind this presumption is that "the public is entitled to know what its government is doing and why." <u>Piper v. DOJ</u>, 294 F. Supp. 2d 16, 20 (D.D.C. 2003) (<u>amended</u>, 428 F. Supp. 2d 1, and <u>affirmed</u>, 222 Fed. Appx. 1) (citation omitted). To this end, "a federal agency is required to release all records that are responsive to a request for the production of the records." <u>Maydak v. DOJ</u>, 254 F. Supp. 2d 23, 32 (D.D.C. 2003). If it fails to do so, the Court is authorized to "enjoin [a federal] agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." <u>Id.</u> (citation omitted).

Here, however, the FBI has intentionally misled Negley and this Court by failing to produce documents that are responsive to Negley's FOIA request. Indeed, almost six years after Negley's FOIA request, the FBI has yet to produce: (1) the entire Serial 3041; (2) any documents from Serial 3865; and (3) File S-1575. Moreover, the FBI only produced ten pages from Serial 3041 after Negley was forced to file this lawsuit and another two pages in response to this Court's January 8, 2007 Order. As set forth below, Negley is entitled to partial summary judgment on the FBI's failure to produce these responsive documents and an order requiring their production.

1.    **The FBI admits that there are at least seven additional pages in Serial 3041 that are responsive to Negley's FOIA request, but it has not produced those pages or provided a <u>Vaughn</u> index for any withholdings, in violation of Court Order.**

On January 8, 2007, this Court entered an Order requiring, among other things, the FBI to submit a Praecipe as to "whether the 47 pages of SUB S0-3041 previously released to Plaintiff [referred to herein as the "47 Pages"] represent all pages in SUB S0-3041[.]" Order dated January 8, 2007 (Doc. #43), ¶ 1.b. If not, the FBI was ordered to produce to Negley any additional pages that related to him or a <u>Vaughn</u> index for any redactions/withholdings. <u>See</u> <u>id.</u>, ¶ 2. In its corrected Praecipe (which was filed on January 19, 2007), the FBI responded that: "In addition to the 47 pages of SUB S0-3041 previously released to Plaintiff [that] represent all the pages in SUB-S0-3041, two additional pages were found." Notice of Correction to Praecipe dated January 19, 2007 (Doc. #47). Therefore, the FBI represented that there were a total of 49 pages in Serial 3041, all of which had been produced (or redacted/withheld under FOIA exemptions) to Negley.

Hardy, however, testified that the FBI misrepresented both the contents of Serial 3041 and ignored its obligation to comply with the Court's Order. Hardy's third declaration states that, in fact, Serial 3041 contains seven additional pages, for a total of 56 pages, and not 47 pages as the FBI had represented for the prior five years or 49 pages as the FBI represented to this Court on January 19, 2007. <u>See</u> Ex. 5, ¶ 5 n.2. Notably, the FBI has failed to provide any explanation for why it previously misrepresented that Serial 3041 consisted of 47 or 49 pages, when it did not.

Further, at his deposition, Hardy confirmed that the FBI has not produced those seven pages from Serial 3041, even though it is aware of this Court's Order requiring it

do so.[29]  See Ex. 6, at 169-70.  There is no dispute that these seven pages are responsive

to Negley's FOIA request; yet, the FBI has withheld them in their entirety without

producing a Vaughn index to justify doing so.  This not only violates the FBI's

obligations under FOIA, but ignores the Court's January 8, 2007 Order, which ordered

the FBI to search for and produce all responsive documents from Serial 3041, not just

select ones.  Therefore, Negley is entitled to partial summary judgment ordering the

production of the entire Serial 3041.

> **2.    Similarly, the FBI admits that Serial 3865 contains documents that are responsive to Negley's FOIA request, but has not produced those pages or provided a Vaughn index.**

Hardy's second declaration (submitted four years after Negley's FOIA request) is

the first time that the FBI makes any mention of the existence of a second serial, Serial

3865, that contains documents responsive to Negley's FOIA request:

> [A]s a result of the FBI's renewed search of the CRS, we have reconfirmed [sic] that plaintiff's name was indexed to serials 3041 and 3865 in subfile S-0, a subfile in the main UNABOM file.  Those serials, which consist of 47 pages, have been processed and released to plaintiff previously.

---

[29] The FBI's explanation for this admitted violation of the January 8, 2007 Order is that the seven pages withheld are so-called "duplicates" of previously produced documents.  This explanation should be rejected for multiple reasons.  This Court did not permit the FBI to withhold allegedly duplicative documents and the FBI may not unilaterally decide to ignore the Court's directive.  Moreover, given the FBI's misrepresentations throughout this case (including that it hid the existence of these seven additional pages until very recently), this Court should not rely on the FBI's self-serving representation in this regard.  To this end, some documents produced by the FBI, which appear duplicative at first glance, are not in fact duplicative because one version contains additional or different handwritten notes (see, e.g., Ex. 2-C).  Therefore, even if the typed portions of two documents are duplicative, one version may contain additional information or notations not appearing on the previously produced copy.

See Ex. 4, ¶ 7.  Notably, the FBI has never attempted to address why Hardy's first

declaration or the many searches that the FBI indicated were previously conducted did

not reveal and/or lead to the production of Serial 3865 when it clearly responds to

Negley's FOIA request.  See Ex. 6 at 170-71.  This alone raises serious doubt about the

propriety of the FBI's response to Negley's FOIA request.

Moreover, and although his declaration suggests otherwise, Hardy testified at his

deposition that the FBI, in fact, has not released the contents of Serial 3865 to Negley.

See id. at 136 ("We did not release the contents of serial 3865 to the Plaintiff.").  Nor has

the FBI produced a Vaughn index to justify its withholding of the serial.  Indeed, there is

no authority under FOIA to permit an agency to withhold documents without applicable

FOIA exemptions to justify the withholdings.[30]  Therefore, Negley is entitled to partial

summary judgment ordering the production of the entire contents of Serial 3865.

**3.        The FBI should be ordered to produce File S-1575.**

For almost six years, the FBI has provided inconsistent explanations for why it

will not produce File S-1575.  Most recently (prior to ASAC Holly's deposition), the FBI

took the position that it will not produce File S-1575 because it does not relate to him.  In

discovery, however, one of the FBI's own witnesses testified under oath that File S-1575

relates to Negley.  After years of stonewalling, the FBI now should be ordered to produce

File S-1575.

_____

[30] Again, the FBI's apparent explanation for this failure to produce responsive
documents is that the documents in Serial 3865 are allegedly duplicates of the documents
in Serial 3041.  This explanation, however, is no more persuasive here than it is in
connection with the seven pages withheld from Serial 3041.  See supra note 29.
Moreover, witnesses have indicated that Serial 3041 and Serial 3865 contain a different
number of pages, thereby suggesting that one serial cannot be truly duplicative of the
other.  Compare Ex. 5, ¶ 5 & n.2, with Ex. 6 at 132.

ASAC Holly, "the agent with the most knowledge regarding the investigation of Mr. Negley" and who is familiar with the file numbering system used in the investigation for UNABOMB suspects, testified:

> Q    But would you anticipate that that Sub S 1575 would relate to Mr. Negley or could that relate to someone else?
> A    No, I would -- because it's on Exhibit Number 4 relative to the investigation conducted and the interview conducted with Mr. Negley, that that would be attributed to Mr. Negley, 1575. . . .

See Ex. 7 at 115.  Leaving no doubt, ASAC Holly testified again and again that File S-1575 related to Negley:

- A    . . . 1575 as a suspect sub file makes sense.
  Q    For Mr. Negley?
  A    For Mr. Negley.[31]

- The Sub S 1575 based upon my recollection appears to be the suspect file under which we documented and worked on the interview of Mr. Negley.[32]

- Q    Okay.  Do you know exactly what S 1575 or 7575 is?
  . . .
  A    It appears to be the suspect sub file for Mr. Negley.[33]

- Q    . . . does that also suggest to you or confirm for you that there was -- that Mr. Negley was suspect 1575 with the file number 149A-SF-106204?
  A    Yes.
  Q    And so that I understand how FBI file numbers work, would that suggest that the file number would be 149A-SF-106204-S-1575?
  A    Correct.[34]

In addition to the FBI's own witness testifying that "Sub S 1575 . . . [is] the suspect file under which we documented and worked on the interview of Mr. Negley[,]"

---

[31] Id. at 116.

[32] Id. at 144.

[33] Id. at 144.

[34] Id. at 167.

several documents that relate to Negley and that were previously produced by the FBI

specifically reference File S-1575.  See Ex. 2-C.  In fact, one such document (dated

October 18, 1995) that relates exclusively to Negley contains a handwritten notation

(towards the middle of the page, in between the "Synopsis" and "Reference" sections)

identifying Negley as "Suspect 1575."  See id. (first page).  It defies reason to suggest

that although no less than three documents about Negley reference File S-1575 and even

refer to Negley as "Suspect 1575," which connection was confirmed by ASAC Holly,

File S-1575 itself does not contain a single document about Negley.[35]  Based on this

record, it is clear that File S-1575 is responsive to Negley's FOIA request.  Since the FBI

has not produced a Vaughn index to justify withholding the file, the FBI should be

ordered to produce File S-1575 in its entirety.

Even assuming, however, that File S-1575 does not relate to Negley (which it

clearly does, as set forth above), the FBI should be ordered to produce it because

Negley's April 23, 2002 amended FOIA request sought File S-1575 in its entirety,

regardless of its content.  See Ex. 1-D.  Subsequent correspondence between Negley and

the FBI (prior to the filing of this lawsuit) confirmed that Negley requested File S-1575

without regard to whether it related to Negley.  See Ex. 1-H ("You also informed Mr.

Negley 'that the records that consist of [File S-1575] are not the same records that you

---

[35] Prior to the deposition of Hardy, Negley's counsel and the FBI's counsel
corresponded at some length regarding Negley's request that Hardy bring File S-1575
with him to his deposition so Hardy could review the file under oath and testify regarding
whether File 1575 is responsive to Negley's FOIA request.  To alleviate any concerns,
Negley's counsel made clear that neither Negley nor his attorneys had any intention of
either seeking to review File 1575 themselves (at that time) or requiring that a copy of the
file be included as an exhibit to the deposition, unless later ordered by the Court.
Nevertheless, the FBI refused.

faxed to our Office.'  He knows that.  **He still wants to obtain [File S-1575], however.**")
(Emphasis added.).  To dispel any doubt, Negley has submitted an uncontraverted
declaration on this issue:

> To the extent that there is any ambiguity in the language of my April 23,
> 2002 correspondence to the FBI, **it was and still is my intent to amend
> my FOIA request to include, in addition to all files about me at the
> SFFO, the entire File No. S-1575, regardless of whether or not that file
> is about me**.

Ex. 2, ¶ 3 (emphasis added).  It is undisputed, therefore, that the amended FOIA request
sought, in addition to all files about Negley at the SFFO, File S-1575, regardless of
whether or not it pertained to Negley.

For either or both of the above reasons, Negley is entitled to partial summary
judgment ordering the FBI to produce File S-1575 and a <u>Vaughn</u> index for any
documents withheld or redacted.

**4.      Negley is entitled to partial summary judgment for having
obtained the production of new documents as a result of this
lawsuit.**

At the time that Negley filed the pending lawsuit on October 17, 2003, the FBI
had released – from Serial 3041 of the Main File only – 25 non-redacted pages and 12
redacted pages, for a total of 37 responsive pages.  Negley filed this lawsuit, in part, to
obtain access to other documents that were responsive to his FOIA request.  Since the
inception of this lawsuit, Negley has been successful in obtaining the release of an
additional 12 pages from Serial 3041.  In this regard, Negley already has obtained partial
relief in connection with this lawsuit.  Therefore, Negley is entitled to partial summary
judgment that the FBI's pre-suit production was deficient to the extent that it did not
include documents obtained by Negley in this action.

III.   **CONCLUSION**

For these reasons, Negley respectfully requests that the Court enter the attached

order granting partial summary judgment in favor of Negley.[36]

Dated: August 24, 2007                                    Respectfully submitted,


                                                          /s/ Prashant K. Khetan
                                                          Paul C. Vitrano, D.C. Bar No. 464223
                                                          Prashant K. Khetan, D.C. Bar No. 477636
                                                          ROSS, DIXON & BELL, LLP
                                                          2001 K Street, NW
                                                          Washington, DC  20006-1040
                                                          Telephone:  (202) 662-2000
                                                          Facsimile:  (202) 662-2190


356962 v1

---

[36] Negley seeks partial summary judgment because some of the relief sought (e.g., the FBI conducting additional searches; the FBI's submission of a Vaughn index) will require additional review by Negley and possibly this Court.